EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br>            v.<br><br>Octavio Báez López<br><br>    Recurrido | Certiorari<br><br>2013 TSPR 143<br><br>189 DPR ____ |

Número del Caso: CC-2012-461

Fecha: 10 de diciembre de 2013

Tribunal de Apelaciones: Región Judicial de Bayamón

Oficina del Procurador General:

      Lcdo. Luis Román Negrón
      Procurador General

      Lcda. Lisa M. Durán Ortiz
      Procuradora General Auxiliar

Abogado del Recurrido:

      Lcdo. Ramón Negrón Colón

Materia: Derecho Constitucional – Registros y Allanamientos: Percepción del tacto como excepción al requisito de orden judicial previa a un registro.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.

                                  CC-2012-461     Certiorari

Octavio Báez López

    Recurrido


Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ


San Juan, Puerto Rico, a 10 de diciembre de 2013.

El recurso ante nuestra consideración requiere a este Tribunal analizar si el descubrimiento de evidencia mediante la percepción por tacto es un corolario de la doctrina de plena vista. Respondemos en la afirmativa, por lo que incorporamos esta excepción al requisito de una orden previa para un registro válido.

I

El Ministerio Público presentó una acusación contra el Sr. Octavio Báez López por el delito de portar un arma de fuego sin licencia para ello. Art. 5.04 de la Ley de Armas, 25 L.P.R.A. sec.

458c. [1]

Luego de los procedimientos de rigor, el señor Báez López solicitó la supresión del arma de fuego incautada. Al así hacerlo, argumentó que no existía una emergencia que justificara la acción de la agente del orden público, al buscar en el interior de su cartera de cintura, sin una orden de registro previa. Indicó que, tras sufrir el accidente, no se encontraba inconsciente y que la agente Rivera Alvarado recibió del paramédico su cartera de cintura, la cual palpó y **"sintió lo que a su experiencia era un arma de fuego"**. Acto seguido, **"abrió la cartera y extrajo una pistola Smith & Wesson"**. Véase, *Moción de supresión de identificación [sic] del acusado,* Apéndice Petición de Certiorari, págs. 4. El señor Báez López resaltó que la agente admitió que **"su búsqueda en la cartera no tuvo como propósito atender la emergencia en proceso –el accidente de Báez López- sino corroborar su percepción sensorial en la cartera del perjudicado"** y reconoció que **"rebuscó en su interior para dar en su interior [con] un arma de fuego, no para dar con su identificación"**. Íd., *supra*, págs. 7-8. El Ministerio Público se opuso a la supresión de evidencia.

El Tribunal de Primera Instancia celebró una vista para dilucidar si procedía la supresión de la evidencia. Durante ésta, y en lo pertinente, el testimonio presentado

---

[1] Smith & Wesson negra, calibre .40 mm, modelo XDM-40 cargada con una munición en recámara y 15 municiones.

por la agente Rivera Alvarado revela que acudió a atender un accidente de motora como parte de su patrullaje preventivo. Al llegar al lugar, encontró al señor Báez López un poco aturdido y tirado en el pavimento con la cabeza, manos y piernas ensangrentadas, por lo que llamó al precinto para que enviaran a emergencias médicas. Una vez llegaron los paramédicos, le removieron una cartera negra que portaba el señor Báez López de forma transversal en su torso. Ésta fue entregada a la agente, quien al palparla sintió un arma de fuego y procedió a abrir la cartera. Así, pudo ver que en el interior había una pistola. Luego, el señor Báez López fue trasladado al hospital y allí fue entrevistado por la agente. Ésta le leyó las advertencias legales y le preguntó sobre el arma. El acusado admitió que no tenía licencia para poseer y portar armas de fuego. De otra parte, el paramédico que intervino con el señor Báez López indicó que le removió la cartera y entregó la misma a la agente. A su vez, testificó que encontró al acusado en el pavimento con sangrado en la cara. Señaló que éste le respondía a sus preguntas, dio sus datos personales y le mencionó que le dolía la cabeza y las rodillas.

Tras escuchar la prueba, el Tribunal de Primera Instancia emitió una Resolución en la cual declaró con lugar la solicitud de supresión de evidencia. El foro primario concluyó que la agente justificó el registro de la cartera a base de una situación de emergencia. Sin embargo, lo que quería era verificar si efectivamente

había un arma. Así, el tribunal de instancia destacó que, si la agente tenía una sospecha de que en el interior de la cartera había un arma, debió solicitar una orden de registro.

En desacuerdo con la determinación del foro de instancia, el Ministerio Público presentó un recurso de *certiorari* ante el Tribunal de Apelaciones. En síntesis, arguyó que el foro primario pasó por desapercibido el interés y la facultad investigativa de un agente del orden público, no sólo para registrar el bulto con el fin de identificar a una persona herida tras sufrir un accidente de tránsito sino que, además, para registrarlo una vez percibe inevitablemente un arma de fuego en el interior de ese bulto. Ante ello, el Ministerio Público argumentó que no procedía suprimir la evidencia porque se trató de un registro razonable debido a que: (1) la expectativa de intimidad de un motociclista herido es limitadísima; (2) el accidente justificó el registro de emergencia para procurar la identidad del herido, ya que éste estaba aturdido y con contusiones en la cabeza; y (3) una vez el agente inevitablemente percibe sensorialmente la posible existencia de un arma de fuego en el interior del bulto, se justifica la corroboración de tal percepción, pues se trata de un objeto inherentemente peligroso y altamente reglamentado por el Estado.

Mediante Resolución emitida el 29 de marzo de 2012, el Tribunal de Apelaciones denegó el recurso de *certiorari* presentado por el Ministerio Público. El foro apelativo

intermedio concluyó que si la agente Rivera Alvarado percibió un arma mediante el tacto, procedía poner bajo arresto al recurrido y hacerle las advertencias, para luego proceder al registro incidental al arresto.

Oportunamente, el Ministerio Público solicitó reconsideración ante el Tribunal de Apelaciones. Reiteró sus planteamientos y añadió que el arma iba a ser descubierta eventualmente cuando se preparara el correspondiente recibo de propiedad. El foro intermedio declaró No Ha Lugar la solicitud de reconsideración.

Insatisfecho, el Ministerio Público compareció ante este Tribunal y solicitó la revocación de la Resolución emitida por el Tribunal de Apelaciones. Para ello, señaló que erró el tribunal intermedio al validar la supresión del arma de fuego a pesar de que se trató de un registro razonable porque: (1) la agente tuvo la creencia razonable de la existencia de una emergencia que justificó el registro; (2) el descubrimiento del arma de fuego ilegal hubiese sido inevitable cuando la agente realizara el obligado recibo de propiedad de la cartera; y, (3) la agente percibió mediante tacto ("*plain feel*") el arma de fuego que estaba en el interior del bolso del acusado herido, la cual le fue legítimamente entregada por el paramédico.

El 4 de junio de 2012 expedimos el recurso ante nuestra consideración. Transcurridos los términos para que las partes presentaran sus respectivos alegatos procedemos, a resolver conforme a derecho.

II

A.

La protección contra registros, incautaciones y allanamientos irrazonables es una de índole constitucional. La Sec. 10 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, dispone lo siguiente:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por la autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

Por su parte, la Cuarta Enmienda de la Constitución de los Estados Unidos de América, L.P.R.A., Tomo 1, establece que:

> No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá mandamiento, sino en virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado y las personas o casas que han de ser detenidas o incautadas.

Ambas disposiciones constitucionales protegen el derecho del pueblo contra registros, incautaciones y allanamientos irrazonables que puedan afectar sus personas, casas, papeles y efectos. Véase, E.L. Chiesa, _Derecho procesal penal de Puerto Rico y Estados Unidos,_

Colombia, Ed. Forum, 1991, T. 1, Vol. I, pág. 283. La razón de estos preceptos constitucionales es proteger el derecho a la intimidad y dignidad del individuo, amparar sus documentos y pertenencias frente a actuaciones irrazonables del Estado, e interponer la figura del juez para ofrecer una mayor garantía de razonabilidad a la intervención con los ciudadanos. Pueblo v. Díaz, Bonano, 176 D.P.R. 601, 611-612 (2009); Blassini *et als.* v. Depto. Rec. Naturales, 176 D.P.R. 454, 463-464 (2009); Pueblo v. Martínez Torres, 120 D.P.R. 496, 500 (1988); E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. 197, 207 (1984).

A pesar de la similitud de ambas cláusulas constitucionales, la contenida en nuestra Constitución limita expresamente al Ministerio Público con relación al uso que le puede dar al objeto incautado mediante un registro **irrazonable** sin una orden previa. Así, nuestra garantía constitucional dispone palmariamente que la evidencia incautada sin una orden previa será inadmisible en los tribunales. 3 Diario de Sesiones de la Convención Constituyente 1566 (1961); Pueblo v. Rivera Colón, 128 D.P.R. 672, 681-682 (1991).[2] Ante ello, y por razón de que nuestra Constitución reconoce y concede unos derechos más abarcadores que los garantizados en la Constitución federal, se articula que la Sec. 10 de nuestra Ley Suprema

_____

[2]Nótese que, a nivel federal, es mediante jurisprudencia que se resuelve que es inadmisible aquella evidencia obtenida en violación a la Cuarta Enmienda de la Constitución federal. Véanse, Mapp v. Ohio, 367 U.S. 643 (1961); E.L. Chiesa, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1991, T. 1, Vol. I, págs.290-291.

es de factura más ancha. Así, reconocemos como protección mínima la contemplada contra registros e incautaciones a base de la Cuarta Enmienda federal, sin impedimento alguno para ampliar nuestra protección constitucional. Véanse: Blassini *et als.* v. Depto. Rec. Naturales, *supra*, pág. 463; Pueblo v. Rivera Colón, *supra*, pág. 680; Pueblo v. Malavé González, 120 D.P.R. 470, 475-476 (1988); Pueblo v. Falú Martínez, 116 D.P.R. 828, 837 (1986); Pueblo v. Lebrón, 108 D.P.R. 324, 327 (1979); Pueblo v. Dolce, 105 D.P.R. 422, 428-429 (1976). Además, refiérase a: Cooper v. California, 386 U.S. 58, 62 (1967); United States v. Sibron, 392 U.S. 40, 60-61 (1968).

La norma general requiere que se obtenga una orden judicial para efectuar un registro. Pueblo v. Malavé González, *supra*, pág. 477. Procesalmente, las Reglas 230 a la 234 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, establecen los requisitos y fundamentos para la expedición de una orden de allanamiento, su forma y contenido, así como el procedimiento para su diligenciamiento y, además, el mecanismo procesal para solicitar la supresión de evidencia ilegalmente obtenida. Pueblo v. Cruz Calderón, 156 D.P.R. 61, 69 (2002).

Ante un reclamo de que se violó el derecho constitucional contenido en la Sec. 10 del Art. II de nuestra Constitución, es necesario dilucidar si, en efecto, hubo un registro que haya infringido la expectativa razonable de intimidad que nuestra sociedad reconoce sobre el objeto del registrado. Pueblo v. Ortiz

Rodríguez, 147 D.P.R. 433, 442-443 (1999). Para ello, es determinante establecer si la persona tiene un derecho a abrigar una expectativa razonable de intimidad dentro de las circunstancias particulares que rodean el caso y si ese derecho está reconocido por nuestra sociedad. Pueblo v. Ortiz Rodríguez, *supra*. Véase, además, Smith v. Maryland, 442 U.S. 735, 740-741 (1979); Katz v. United States, 389 U.S. 347 (1967). En este sentido, la exposición del objeto al público, en mayor o menor grado, determinará el interés constitucional que se posee sobre éste, y repercutirá en el alcance de la protección. O.E. Resumil de San Filippo, Derecho Procesal Penal, New Hampshire, Ed. Equity, 1990, T.1, pág. 205. El resultado es que un lugar u objeto gozará de la protección constitucional indicada dependiendo de la naturaleza de la intrusión gubernamental, su efecto sobre la expectativa de intimidad del ciudadano y la necesidad y utilidad del método investigativo utilizado para implantar la ley. Pueblo v. Rivera Colón, *supra*, pág. 683.

                              B.

    Una vez se determina que existe una expectativa razonable de intimidad que puede estar protegida por la garantía constitucional contenida en la Sec. 10 del Art. II de nuestra Constitución, y que en efecto hubo un registro por parte del Estado, se debe realizar un balance de intereses entre esa expectativa y los intereses públicos que hayan motivado la actuación estatal. Pueblo v. Díaz, Bonano, *supra*, pág. 613; Pueblo v. Yip Berríos,

142 D.P.R. 386, 409 (1997); Pueblo v. Dolce, *supra*, pág. 434-435.

El referido balance no es uno mecánico. Éste requiere que se considere la pugna entre la protección de nuestros ciudadanos y el interés de la sociedad de las asolaciones perpetuadas por el crimen. Como hemos expresado, "nuestra tarea es conciliar los intereses en pugna y no permitir que uno pulverice al otro. El sistema democrático de vida se funda en la libertad con orden, no en el orden sin libertad o en la libertad que lleve al caos". Pueblo v. Dolce, *supra*, págs. 434-435. Véase, además: E.L. Chiesa, op cit., págs.406-407.

Empero, el hecho aislado de que el objeto en controversia ha sido incautado sin una orden previa de un tribunal, por sí solo, no conlleva la inadmisibilidad de la evidencia así obtenida. Un registro sin una orden judicial activa una presunción *iuris tantum* de que éste fue irrazonable e inválido. En estos casos, el Estado siempre puede demostrar que los hechos y la situación particular justifican la intervención policial sin la referida orden, constituyéndose así una excepción a la norma general. Pueblo v. Blase Vázquez, 148 D.P.R. 618, 632-633 (1999); Pueblo v. Santiago Alicea I, 138 D.P.R. 230, 235 (1995); Pueblo v. Malavé González, *supra*, pág. 476. Véanse, también: Missouri v. McNeely, 569 U.S. ____ (2013); 133 S.Ct. 1552; Coolidge v. New Hampshire, 403 U.S. 443 (1971).

Este Tribunal ha adoptado y definido situaciones excepcionales en las que no es indispensable la orden judicial previa. Al hacerlo, hemos sido enfáticos en que cada una de éstas no responden a reglas automáticas y deben examinarse a la luz de los hechos específicos de cada caso. Pueblo v. Blase Vázquez, *supra*, pág. 633; Pueblo v. Miranda Alvarado, 143 D.P.R. 356, 363 (1997). En todas las instancias mencionadas se ha resuelto que no existe una expectativa razonable de intimidad y por lo tanto, no se violenta el mandato constitucional. Entre otras, se han validado las circunstancias siguientes: (1) un *registro incidental a un arresto legal*, Pueblo v. Pacheco Báez, 130 D.P.R. 664 (1992); Pueblo v. Malavé González, *supra*; Pueblo v. Zayas Fernández, 120 D.P.R. 158 (1987); Pueblo v. Costoso Caballero, 100 D.P.R. 147 (1971);[3] (2) un *registro consentido voluntariamente de forma expresa o implícita*, Pueblo en interés del Menor N.O.R., 136 D.P.R. 949 (1994); Pueblo v. Narváez Cruz, 121 D.P.R. 429 (1988); Pueblo v. Acevedo Escobar, 112 D.P.R. 770 (1982); Pueblo v. Tribunal Superior, 96 D.P.R. 270 (1968); (3) un *registro en situación de emergencia*, Pueblo v. Rivera Collazo, 122 D.P.R. 408 (1988); (4) *evidencia*

---

[3]Recordamos que no es permisible un registro sin orden de allanamiento aunque sea contemporáneo a un arresto válido, si el área no está al alcance de la persona arrestada. El propósito de ello es ocupar armas que puedan ser empuñadas y utilizadas por el acusado para agredir a los agentes del orden público o para intentar una fuga y para ocupar evidencia que de otro modo se pueda destruir. La doctrina no convalida todo registro incidental a un arresto legalmente efectuado. Véanse: Pueblo v. Cruz Torres, 137 D.P.R. 42, 46 (1994); Pueblo v. Costoso Caballero, 100 D.P.R. 147, 152-153 (1976); Pueblo v. Dolce, 105 D.P.R. 422, 434-435 (1976).

*ocupada en el transcurso de una persecución*, <u>Pueblo v. Riscard</u>, 95 D.P.R. 405 (1967); (5) *evidencia a plena vista,* <u>Pueblo v. Cruz Torres</u>, 137 D.P.R. 42 (1994); <u>Pueblo v. Muñoz, Colón y Ocasio</u>, 131 D.P.R. 965 (1992); <u>Pueblo v. Dolce</u>, *supra*; (6) cuando el agente del orden público obtiene conocimiento de la existencia del material delictivo por el olfato, <u>Pueblo v. Acevedo Escobar</u>, *supra*, pág. 779; <u>Pueblo v. Díaz, Bonano</u>, *supra*; (7) *evidencia arrojada o abandonada*, <u>Pueblo v. Ortiz Zayas</u>, 122 D.P.R. 567 (1988); <u>Pueblo v. Ortiz Martínez</u>, 116 D.P.R. 139 (1985); <u>Pueblo v. Lebrón</u>, 108 D.P.R. 324 (1979); (8) un *registro o allanamiento de una estructura abandonada*, <u>Pueblo v. Erausquín Martínez</u>, 96 D.P.R. 1 (1968); (9) *evidencia obtenida durante un registro administrativo*, <u>Pueblo v. Sánchez Molina</u>, 134 D.P.R. 577 (1993); <u>Pueblo v. Rodríguez Rodríguez</u>, 128 D.P.R. 438 (1991), siempre que se cumpla con las limitaciones expresadas por este Tribunal en <u>Blassini *et als*. v. Depto. Rec. Naturales</u>, *supra*; (10) un *registro tipo inventario*, <u>Pueblo v. Rodríguez Rodríguez</u>, *supra*;[4] ó (11) *evidencia obtenida en un lugar público -como el aeropuerto-, como resultado de la*

---

[4]Esta excepción tiene lugar cuando se convalida un registro como parte de un procedimiento rutinario y estandarizado de hacer un inventario con el propósito de salvaguardar el contenido de los objetos que por ley la policía mantiene bajo su control en espera de que se lleve a cabo un procedimiento de confiscación. La excepción requiere al Estado demostrar que procede *prima facie* la incautación preliminar de la propiedad con el propósito de confiscarla; que existe un procedimiento o unas guías establecidas para este tipo de situaciones y que esa acción se efectúa siguiendo estrictamente el procedimiento establecido.

*utilización de canes para olfatear,* <u>Pueblo v. Díaz, Bonano</u>, *supra.*

### III

Ante esta Curia, el Procurador General sostiene que no procede la supresión de evidencia. Explica que el registro no fue irrazonable e invoca tres excepciones para la admisibilidad de la prueba. Específicamente, sostiene que: (1) el registro fue durante una situación de emergencia; (2) el arma de fuego hubiese sido inevitablemente descubierta al realizarse un recibo de propiedad; y (3) la agente percibió el arma de fuego mediante tacto. Discutamos cada una de estas excepciones.

### A. <u>Situación de emergencia</u>

Los registros de emergencia constituyen una excepción a la inadmisibilidad de evidencia obtenida mediante un registro sin una orden previa. Véase, <u>E.L.A. v. Coca Cola Bott. Co.</u>, *supra*, págs. 207-208. A estos efectos, debemos recordar que lo constitucionalmente prohibido es el registro irrazonable. Lo que constituye una emergencia suficiente para validar un registro sin previa orden dependerá del grado de emergencia versus la expectativa razonable de intimidad que se pueda oponer frente al Estado.

En lo particular, en <u>Pueblo v. Rivera Collazo</u>, *supra*, este Tribunal adoptó la excepción de situaciones de emergencia para admitir prueba incautada sin una orden judicial. De esta manera, avalamos las actuaciones de unos agentes del orden público cuando, al no llegar una

ambulancia, actuaron con el fin de socorrer a un conductor de un automóvil que estaba inconsciente, con dificultad al respirar y quien requería de inmediata asistencia. Durante el proceso, los agentes observaron unas jeringuillas y abrieron una cajetilla de cigarrillos dentro de la cual había un sobre con cocaína. Este Tribunal, enfatizó que la intención de los agentes fue la de ayudar al ciudadano accidentado y no la de obtener evidencia relacionada a un delito. Ante tales hechos, cualquier registro a la persona o a sus pertenencias era vital para el tratamiento médico. Íd., pág. 419. Sin embargo, ello no significa que todo accidente de tránsito constituya, por sí mismo, una emergencia médica que conlleve la aplicación de la excepción de situación de emergencia.

Otras situaciones que constituyen una emergencia son el entrar a un lugar para salvar la vida o propiedad; investigar lo que parece peligroso para la seguridad pública y privada, independiente del tipo de delito imputado o de la existencia o no de un sospechoso; y socorrer u ofrecer asistencia a una persona que se encuentra en peligro o necesidad. Véase, Chiesa, op cit., págs. 450-451.

Ahora bien, la mera alegación de emergencia infundada y sin explicar, es insuficiente para la admisibilidad de la evidencia. El Estado está obligado a demostrar que tenía una creencia razonable de que existía una emergencia. No existen circunstancias categóricas que constituyan de por sí una situación de emergencia. Para

determinar si un oficial del orden público encara una situación de emergencia que le permita registrar sin una orden, los tribunales debemos examinar la totalidad de las circunstancias. Véase, Missouri v. Mcneely, *supra.* Es la función de los tribunales evaluar la prueba presentada rigurosamente. Así, hemos expresado que "[l]a Policía debe tener la creencia razonable de que existe una emergencia que requiere de su inmediata asistencia para la protección de vidas o de propiedad; la entrada o registro no puede estar motivada por un intento de arrestar o buscar evidencia, y debe haber alguna relación entre la emergencia y el área o sitio en que se penetra". Pueblo v. Rivera Collazo, *supra*, pág. 417.

**B. Descubrimiento inevitable**

La doctrina de descubrimiento inevitable se emplea con el fin de evitar la supresión de aquella evidencia obtenida sin una orden de arresto que está estrechamente vinculada con una intervención ilegal.[5] Mediante ésta, se permite la admisibilidad de la prueba si ésta hubiese sido inevitablemente detectada, es decir, de todas formas iba a ser legalmente obtenida. La justificación para permitir la admisibilidad de la prueba consiste en evitar colocar al Estado en una peor posición de la que estaba antes de la actuación ilegal.[6]

---

[5]En este sentido, se dice que el objeto del "fruto del árbol ponzoñoso" es admisible cuando cumple con cualquiera de las siguientes doctrinas: (1) vínculo atenuado; (2) fuente independiente y (3) descubrimiento inevitable.

[6]Véase, discusión del descubrimiento inevitable mediante investigación discutido en la Opinión disidente del Hon. Federico Hernández Denton en Pueblo v. González,

Para que aplique la doctrina del descubrimiento inevitable, el Estado debe demostrar que existía una investigación en curso que hubiera permitido obtener la misma evidencia objeto de la supresión. En aquellos casos en que el Estado invoque la doctrina de descubrimiento inevitable, al amparo de que realizaba una investigación deber demostrar que: (1) estaba realizando una investigación legal que seguramente hubiera producido la misma evidencia; (2) la investigación era realizada por agentes distintos a los que actuaron ilegalmente y; (3) la investigación era anterior a la actuación ilegal. Véase, C.H. Whitebread y C. Slobogin, Criminal Procedure: An Analysis of Cases and Concpets, Nueva York, Ed. Foundation Press, 2000, pág. 46.

De igual modo, aplica la doctrina de descubrimiento inevitable si a través de un procedimiento rutinario o estandarizado se hubiera permitido el descubrimiento de la evidencia objetada.[7] En otras palabras, si el Estado demuestra que existen normas o procedimientos habituales mediante los cuales lo ilegalmente obtenido hubiera sido encontrado de forma legal, entonces, no procede la

---

167 D.P.R. 350, 358-359 (2006) (Sentencia); Nix v. Williams, 467 U.S. 431 (1984).

[7]Este tipo de procedimiento estandarizado puede ser los registros de inventario, registros en aeropuertos o registros en la frontera. En cuanto al registro tipo inventario como un procedimiento rutinario refiérase a Pueblo v. Rodríguez Rodríguez, 128 D.P.R. 438 (1991). Dicho procedimiento no es de aplicación en el caso de autos, pues no estamos ante un proceso de confiscación o incautación en relación a una persona que ha sido arrestada o ingresada a una institución penal.

supresión. Ello, pues, por lo general este tipo de procedimiento estandarizado es razonable, ya que el registro es limitado en su extensión y responde a una función necesaria para la protección de: (1) el interés propietario del dueño; (2) los policías o custodios del reclamo de pérdida o daño a la propiedad custodiada y (3) agentes de la posibilidad de algún daño. Véanse: Florida v. Wells, 495 U.S. 1 (1990); Colorado v. Bertine, 479 U.S. 367 (1987); Illinois v. Lafayette, 462 U.S. 640 (1983); South Dakota v. Opperman, 428 U.S. 364, 376 (1976); United States v. Infante-Ruiz, 13 F.3d 498, 503-504 (1er. Cir. 1994)[8]; People v. Bayles, 82 Ill. 2d 128 (1980); 411 N.Ed 1346, cert. denied Illinois v. Bayles, 453 U.S. 923 (1981); Chiesa, op. cit., págs. 321-325. Véase, también, W.R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, 5ta. Ed., West Pub. Co., 2012, Vol. 3, sec. 5.5(b); W.R. LaFave y otros, Criminal Procedure, 3ra. Ed., West Pub. Co., West Pub. Co., 2007, Vol. 3 sec. 9.3(e).

Claro está, le corresponde al Ministerio Público presentar evidencia que sostenga que el descubrimiento del objeto hubiere sido inevitable. Para ello, podrá presentar la política escrita, el testimonio del agente o establecer el tipo de rutina a seguir. United States v. Infante-Ruiz, supra, pág. 503.

---

[8]En este caso se suprimió un arma de fuego que se encontraba en un bulto dentro del baúl del vehículo arrendado en el que fue detenido el acusado mientras transitaba por la Parguera, Lajas, Puerto Rico. Entre otras, descartó el descubrimiento inevitable debido a la ausencia de evidencia en cuanto al procedimiento rutinario llevado por la policía en estos casos.

## C. **Percepción mediante los sentidos**

La percepción mediante los sentidos constituye otra de las excepciones a la regla general de inadmisibilidad de prueba obtenida sin una orden de arresto. La norma general es que no existe protección constitucional contra la inspección de objetos que están a la plena percepción de los agentes. Para que proceda la admisibilidad de la evidencia es necesario que exista una justificación para que los agentes estén en el lugar desde el cual percibieron el objeto y la incautación surja por la percepción misma y no del registro realizado. Chiesa, op. cit., pág. 434. Precisamente, se ha permitido la admisibilidad de objetos que se encuentren a plena vista o aquellos que se perciban mediante el olfato. Para una mejor comprensión de la excepción, exponemos brevemente su trasfondo.

Uno de los casos normativos sobre la excepción de percepción mediante los sentidos es Coolidge v. New Hampshire, *supra*. En éste, el Tribunal Supremo de los Estados Unidos suprimió cierta evidencia obtenida en un caso de asesinato en primer grado, por lo que revocó la convicción del acusado. Al así hacerlo, la Corte Suprema de los Estados Unidos discutió y delimitó los contornos de la doctrina de descubrimiento a plena vista. No obstante, el Máximo Foro Federal concluyó que la excepción de plena vista no aplicaba a los hechos ante su consideración.

Concretamente, y en lo pertinente, en Coolidge v. New Hampshire, *supra*, la Corte explicó que el razonamiento de

la doctrina de la excepción de plena vista no conflige con el objetivo de las garantías constitucionales de la Cuarta Enmienda por dos razones sustanciales. De primer plano, la excepción de la doctrina de plena vista no ocurre hasta que hay un registro en proceso y, en segundo lugar, el descubrimiento fue inadvertido. Además, se estableció que para que la doctrina aplique es necesario que: (1) el agente del orden público esté legalmente en el lugar desde el cual percibió el objeto incautado; (2) el descubrimiento tiene que ser de forma inadvertida; y (3) la apariencia delictiva del objeto incautado debe surgir inmediatamente. Por tanto, el hecho aislado de que una cosa esté a simple vista no resulta suficiente para que aplique la excepción. Íd., págs. 466-473. Véase, LaFave, Search and Seizure, Vol. 1, sec. 2.2(a).

La doctrina de la percepción a plena vista evolucionó. En la jurisdicción federal el que el objeto haya sido descubierto inadvertidamente ya no constituye un factor necesario. Ahora, basta que exista una justificación independiente para que el agente del orden público esté legalmente en el lugar desde el cual percibió el objeto y el carácter incriminatorio de éste sea aparente, o exista causa probable para creer que el mismo constituye evidencia de crimen, contrabando o de conducta delictiva. Véanse, Chiesa, op. cit., pág. 439; Horton v. California,

496 U.S. 128 (1990); Texas v. Brown, 460 U.S. 730, 742 (1983).[9]

Igualmente, en la jurisdicción federal la doctrina de la percepción prosperó para incluir otros sentidos adicionales al de la vista. A estos efectos, se ha reconocido la inclusión de evidencia que se puede escuchar (*plain hearing*), olfatear (*plain smell*) o percibir por tacto (*plain feel or touch)* por agentes del orden público. LaFave, Search and Seizure, op cit., Vol. 1, sec. 2.2(a).

El Prof. Chiesa abunda sobre este particular al establecer que "no hay protección constitucional contra la inspección de objetos que están a la **plena percepción** de los agentes, siempre que la presencia de los agentes en el lugar esté independientemente justificada. Para ocupar o incautarse del objeto, **la incautabilidad debe también surgir de la percepción del objeto** y no de su registro. Además, hay que justificar independientemente el acceso al lugar de la incautación". (Énfasis suplido.) Chiesa, op. cit., pág. 434. El distinguido tratadista sostiene que de ordinario se alude a la vista, pero que **la doctrina se extiende a todos los sentidos**. (Énfasis suplido.) Íd., pág. 441 nota al calce 428.

Consciente de este desarrollo judicial, este Tribunal incorporó en nuestro ordenamiento jurídico el impedimento para suprimir evidencia incautada sin orden previa cuando

---

[9]En el caso de Horton v. California, 496 U.S. 128 (1990), la Corte Suprema federal estableció que el carácter inadvertido del descubrimiento o percepción del objeto no es esencial. Véase, Pueblo v. Cruz Torres, *supra*, pág. 53, Opinión concurrente de la Hon. Juez Asociada señora Naveira de Rodón.

ésta se encuentra a plena percepción del agente del orden público. Desde Pueblo v. Dolce, *supra*, establecimos los criterios a considerar cuando determinado objeto incautado sin una orden judicial se encontraba a plena vista, previo al registro. A saber: (1) el artículo debe ser descubierto por estar a plena vista y no en el curso o por razón de un registro; (2) el agente debe haber tenido un derecho previo a estar en la posición desde la cual se percató de la evidencia a ser incautada; (3) la misma debió ser descubierta inadvertidamente; y (4) la naturaleza delictiva del objeto debe surgir de la simple observación. Íd., pág. 436.

Posteriormente, en Pueblo v. Acevedo Escobar, *supra*, mantuvimos la admisibilidad de cierta evidencia ocupada sin una orden de registro al advertir que el agente "percibió el olor de la marihuana" por lo que reconocimos que "a través del sentido del olfato pudo apreciar y derivar el conocimiento de su existencia". Íd., pág. 779. Con este proceder, este Tribunal expresamente reconoció que la percepción mediante el olfato guarda analogía y equivalencia funcional a las situaciones en que se aplica la doctrina de prueba a plena vista, con la única diferencia en el modo en que el objeto es detectado. Indicamos que uno es producto de la visión y otro del sentido del olfato, por lo que no existe fundamento para descartar el valor lógico y jurídico de esa percepción. Íd.

Al día de hoy, este Tribunal no ha tenido la oportunidad de expresarse en cuanto a la analogía de la doctrina de plena vista a lo que los agentes palpan mediante tacto. Por tal razón, enmarcamos el análisis en lo discutido y resuelto por la Corte Suprema de los Estados Unidos.

En la jurisdicción federal existía la discusión en torno a si la percepción mediante tacto era análoga a la doctrina de plena vista o el descubrimiento mediante el sentido del olfato. En esencia, el debate se centraba en si el sentido del tacto podía ser tratado de igual forma que el de la vista y, de ello ser así, qué circunstancias permitían a un agente del orden público estar en una posición en la que palpar un objeto no viola las garantías constitucionales. Véase, LaFave, Criminal Procedure, Vol. 2, sec. 3.2 (b), págs. 76-79.

En un principio, se planteaba que la doctrina de percepción mediante el tacto no era algo diferente de la de plena vista, sino un corolario inevitable de ésta. Más aún, se advertía que Terry v. Ohio, 392 U.S. 1 (1968), fue un presagio en cuanto a la doctrina de percepción mediante el tacto porque se validó la percepción de un arma de fuego por medio de ese sentido. Para que prosperara el descubrimiento mediante el tacto, se proponía requerir que el agente: (1) se encontrase legalmente justificado a estar en el área desde el cual pudo palpar y percibir el objeto; (2) tuviera un motivo independiente para poder colocar sus manos en la propiedad o persona; y (3)

adquiriera simultáneamente con su sentido táctil la creencia de que el objeto percibido constituye evidencia de crimen, contrabando o que puede ser sujeto a incautación. Véase, L. E. Holtz, The "Plain Touch" Corollary: a Natural and Foreseeable Consequence of the Plain View Doctrine, 95 Dick. L. Rev. 521 (1991).

No es hasta que la Corte Suprema federal resolvió Minnesota v. Dickerson, 508 U.S. 366 (1993) que se disipó cualquier duda sobre si la percepción mediante el tacto constituye una secuela permisible de la doctrina de descubrimiento a plena vista. La Corte Suprema federal resolvió esta interrogante sin ambigüedad, en la afirmativa. Íd, págs. 375-378.

Los hechos en Minnesota v. Dickerson, *supra*, surgen cuando dos agentes del orden público intervienen con un sujeto para investigarlo.[10] Durante este proceso, los agentes realizaron un cateo sobre el sujeto, en el cual no encontraron armas, pero uno de los oficiales sintió un bulto en el abrigo de nilón del individuo. El agente escudriñó con sus dedos y pensó que era crack en una bolsa de celofán. Inmediatamente, el agente sacó el objeto del

---

[10]La intervención original realizada por el agente del orden público está validada en lo federal en el caso de Terry v. Ohio, 392 U.S. 1 (1968). Ello, no afecta la aplicación de la doctrina de descubrimiento mediante tacto en otras instancias. En Puerto Rico no se ha extendido expresamente la norma de Terry v. Ohio, *supra*, como tampoco ha sido rechazada categóricamente. Pueblo en interés del Menor N.O.R., 136 D.P.R. 949, 963 (1994). De igual forma, en Puerto Rico hemos reconocido que un agente del orden público puede detectar armas mediante el tacto al permitirse el cateo de los individuos durante un arresto válido. Pueblo v. Costoso Caballero, 100 D.P.R. 147 (1971); Pueblo v. Sosa Díaz, 90 D.P.R. 622, 631 (1964).

bolsillo de la persona y, en efecto, confirmó sus sospechas. Como consecuencia, se acusó al individuo por violaciones a la ley de sustancias controladas. El imputado solicitó la supresión de la evidencia. La corte inferior determinó la validez de la incautación al realizar una analogía con la doctrina de descubrimiento a plena vista. Luego, encontró culpable al imputado. Durante la apelación, la Corte de Apelación de Minnesota revocó el dictamen del foro primario al declinar aplicar la doctrina de descubrimiento mediante el tacto.

La Corte de Apelación de Minnesota rehusó extender la doctrina de plena vista al sentido del tacto bajo el razonamiento de que es menos confiable que el de la vista y mucho más intrusivo a la privacidad del individuo. Asimismo, expresó que la acción realizada por el agente fue mayor a lo permisible. Por su parte, el Tribunal Supremo federal, luego de declinar el rechazo a adoptar la doctrina de descubrimiento mediante tacto, confirmó a la Corte de Apelación de Minnesota por entender que no se cumplieron con los requisitos para aplicar la referida doctrina. Ese análisis es el que resulta importante al caso de autos. Abundamos.

En cuanto al descubrimiento mediante la percepción o el tacto, la Corte Suprema federal expresamente determinó que esta doctrina tiene una aplicación obvia por analogía a casos en los que un oficial descubre contrabando a través del sentido del tacto durante un registro legal. Para descartar las justificaciones de la corte apelativa,

el Tribunal Supremo federal citó en su análisis a Terry v. Ohio, *supra*, y resaltó que en éste se reconoció que mediante el sentido del tacto se puede revelar la naturaleza de un objeto con suficiente confiabilidad para detectar la presencia de armas de fuego y permitir su incautación. Además, indicó que, incluso, de ser cierto que el sentido del tacto es generalmente menos confiable que el de la vista, ello solamente implicaría que los oficiales se amparen en esta justificación con menor frecuencia. A su vez, descartó el temor a incautaciones especulativas debido a que en este tipo de casos la existencia de causa probable siempre será un prerrequisito para el registro. Más aún, la Corte Suprema federal concluyó que no puede existir una invasión adicional a la privacidad del individuo cuando lo que se registra es un objeto cuya identidad es ya conocida. Minnesota v. Dickerson, *supra*, págs. 376-377.[11]

---

[11]La cita directa en Minnesota v. Dickerson, *supra*, págs. 376-377, lee como sigue:

> First, Terry itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of Terry, after all, is that officers will be able to detect the presence of weapons trough the sense of touch and Terry upheld precisely such a seizure. Even if it were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband. Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures. The court's second concern -that touch is more

Acto seguido, la Corte Suprema federal avaló la decisión de la corte apelativa de Minnesota. Concluyó que en las circunstancias del caso ante su consideración, el agente estaba legalmente permitido a encontrarse en una posición desde la cual podía percibir el objeto. Empero, la naturaleza incriminatoria del objeto no fue inmediatamente aparente. Al agente apretar, manipular y deslizarse sobre el objeto, rebasó los límites legales que justificaban su intervención original, por lo que su registro fue uno ilegal. A pesar de ello, reiteró que "una vez más, la analogía con la doctrina de plena vista es acertada".[12] (Traducción nuestra.) Minnesota v. Dickerson, *supra*, pág. 378.

Al analizar el precedente en Minnesota v. Dickerson, *supra*, el tratadista de Derecho Criminal, Wayne R. LaFave, expone que la lógica de la decisión consiste en afirmar que la doctrina de percepción mediante el tacto justifica un registro sin orden. Ello, pues, el acto de palpar hace tan certero e inmediatamente aparente lo que es el objeto que resulta innecesaria una orden judicial que garantice la protección constitucional bajo examen. LaFave, Search & Seizure, op. cit., Vol. 1, sec. 2.2 (a), págs. 605, 608-

---

intrusive into privacy than is sight- is inapposite in light of the fact that the intrusion the court fears has already been authorized by the lawful search for weapons. **The seizure of an item whose identity is already known occasions no further invasion of privacy.** (Énfasis suplido.)

[12]El texto original en inglés lee de la siguiente forma: *Once again, the analogy to the plain-view doctrine is apt.*

614; La Fave, Criminal Procedure, op. cit., Vol. 2, sec. 3.2 (b), pág 78. Véase, además, J.D. Harvey, Jr., Minnesota v. Dickerson: Sense of Touch and the Fourth Amendment, 21 Okla. City U.L. Rev. 151, 170 (1996).

Del marco doctrinal antes reseñado, surge con meridiana claridad que hoy día está resuelto, en la esfera federal, que la percepción mediante el tacto es un derivado del descubrimiento a plena vista. Ésta última ha sido acogida por este Tribunal como una de las excepciones al requisito de una orden judicial previa a un registro. Ello, pues, no hay protección constitucional contra la inspección que está a plena percepción de los agentes. Como consecuencia, y por analogía, no vacilamos en extender la excepción a la percepción por medio del olfato en vista de que la doctrina se extiende a todos los sentidos. Chiesa, op. cit., págs. 434, 441 nota al calce 428. Por tanto, no vemos razón alguna para impedir que la percepción mediante el tacto constituya una excepción al registro judicial sin orden previa. Sin lugar a dudas, la percepción mediante el tacto es un equivalente razonable de la doctrina de plena vista.

Para que la percepción mediante el tacto justifique la incautación del objeto sin una orden previa, será necesario que: (1) el objeto sea descubierto por haber sido palpado y no por razón de su registro; (2) exista una justificación legal para que el agente esté en el lugar desde donde pudo entrar en contacto con la evidencia; (3) el oficial del orden público advino en contacto con la

evidencia de forma inadvertida; y (4) la naturaleza delictiva del objeto surge inmediata y razonablemente a través del sentido del tacto sin que el agente pueda manipular o escudriñar de forma alguna éste. Véase, K. W. Inverson: "Plain Feel": a Common Sense Proposal Following State v. Dickerson, 16 Hamline L. Rev. 247, 277-278 (1992-1993).

Bajo este crisol, la doctrina no provee autoridad para tocar indiscriminadamente. Sin embargo, permite que un agente del orden público interprete lo que pudo percibir mediante el tacto, siempre y cuando haya una justificación para ello. Al igual que el descubrimiento a plena vista, la doctrina de percepción mediante el tacto puede servir de base para que agentes del orden público se excedan en sus intervenciones en violación a la garantía constitucional. Es aquí donde es importante la prudencia en las decisiones, a base de las circunstancias particulares de cada caso. Le corresponde a los tribunales la tarea de discernir si existían razones suficientes para que el agente del orden público inmediatamente percibiera mediante su sentido del tacto suficiente información para concluir que, en efecto, el objeto era lo que creía que es. Una vez la identidad y naturaleza del objeto adviene inminentemente aparente mediante el tacto, no hay una intromisión con los derechos del individuo. Ello, pues, no hay necesidad de una orden previa para descubrir lo que su sentido del tacto ya reveló. Minnesota v. Dickerson, *supra*, págs. 376-377; United States v. Portillo, 633 F.2d

1313, 1320 (9vno. Cir. 1980) cert. denegado, 450 U.S. 1043 (1981). B. Andrew Harvey, Minnesota v. Dickerson and the Plain Touch Doctrine: a Proposal to Preserve Fourth Amendment Liberties during Investigatory Stops, 58 Alb. L. Rev. 871, 904-905 (1994-1995).

El juzgador debe sopesar el hecho de que existen objetos que son fácilmente reconocibles, pues tienen una consistencia y forma distintiva. Más aún, el entrenamiento y experiencia previa de los agentes del orden público les permite reconocer e identificarlos a través de su sentido del tacto de la misma forma que identifican un objeto mediante el sentido de la vista. United States v. Pace, 709 F. Supp. 948, 955 (C.D. Cal. 1989), confirmado en 893 F.2d 1103 (9vno Cir. 1990). ("objects have a distinctive and consistent feel and shape that an officer has been trained to detect and has previous experience in detecting, then touching these objects provides the officer with the same recognition his sight would have produced").

Con el marco doctrinal antes expuesto, pasemos a analizar si procedía la supresión de la evidencia incautada.

IV

En el caso de autos se solicitó la supresión de un arma de fuego incautada sin una orden judicial previa durante la intervención de una agente de la policía al atender un accidente de motora. El arma de fuego se encontraba en una cartera que poseía el señor Báez López y

que fue entregada a la agente por el paramédico que ofreció asistencia durante el accidente. Al recibir la referida cartera, la agente palpó el arma de fuego y procedió a abrir el bolso. Éstos hechos no están en controversia.

Conforme a lo discutido, la garantía constitucional protege a todo objeto en el cual se albergue una expectativa razonable de intimidad. Ciertamente, los efectos personales, como lo es la cartera del señor Báez López, están protegidos por la garantía constitucional contra registros irrazonables. Como condición para su incautación, la norma general requiere que haya una orden judicial previa a menos que el Estado justifique que procede aplicar una excepción. Por tanto, y aunque existe una expectativa de intimidad sobre los efectos personales, ésta no es absoluta. Pueblo v. Bonilla, 149 D.P.R. 318, 329 (1999); United States v. Chadwick, 433 U.S. 1 (1977). En este último se estableció que, como regla general, se requiere una orden judicial para registrar efectos personales. Sin embargo, ello no significa que todo registro de un efecto personal sin orden previa es *per se* inválido. Así, se ha establecido la legalidad de un registro cuando los efectos personales están a plena vista y se cree que son de valor evidenciario. Véanse, LaFave, Search and Seizure, op. cit., Vol. 3, 5.5 (c), págs. 316 y 320; People v. Wright, 804 P.2d, 866 (Colo. 1991), 11 A.L.R. 5th 947.

El Ministerio Público invoca tres excepciones al requisito de una orden judicial previa al registro de la cartera del señor Báez López. Veamos si alguna de éstas aplica.

En primer y segundo lugar, el Ministerio Público nos señala que la agente tuvo la creencia de que estaba ante una situación de emergencia y que el arma de fuego de todos modos hubiera sido descubierta al realizarse un recibo de propiedad. Ninguna de estas excepciones aplica al caso de autos.

Un examen ponderado de la prueba presentada demuestra que no se dan los criterios para que se aplique la doctrina de situación de emergencia como una excepción al requisito de una orden judicial previa. Aunque ciertamente el señor Báez López fue atendido durante un accidente de motora, éste no estaba inconsciente ni aturdido al grado que no pudiera colaborar para su pronta atención médica. Por el contrario, conforme al testimonio del paramédico que lo atendió, el señor Báez López contestó sus preguntas y suministró sus datos personales e, incluso, le expresó dónde sentía dolor. Ante ello, y al igual que el foro primario, entendemos que la agente Rivera Alvarado no podía albergar la creencia razonable de que estaba ante una emergencia. Más aún, sus actuaciones al abrir la cartera así lo demuestran, ya que una vez encontró el arma de fuego desistió de indagar sobre los datos personales del señor Báez López. Los hechos relatados demuestran que no existen las circunstancias que permitieran justificar

la excepción de una situación de emergencia para validar el registro.

De otra parte, durante el proceso apelativo, el Ministerio Público invocó la excepción de descubrimiento inevitable. Ante ello, arguye que la evidencia iba a ser descubierta inevitablemente al realizarse un recibo de propiedad. Sin embargo, al sostener que aplica la referida excepción, el Ministerio Público no cumplió con su deber de demostrar cuál es el procedimiento de recibo de propiedad aplicable a las circunstancias de autos. Simple y llanamente, el Ministerio Público se limita a alegar que existe un procedimiento de recibo de propiedad. No existe un ápice de prueba sobre cómo se implementa el mismo, si aplica para situaciones como las que están ante nuestra consideración, o si éste es uno rutinario o estandarizado. Por tanto, el Ministerio Público no cumplió con su obligación de demostrar que procedía aplicar la referida excepción.

Por último, el Ministerio Público sostiene que no procede la supresión del arma de fuego, ya que ésta fue obtenida luego de que la agente la percibiera mediante el tacto en el interior de la cartera del acusado, la cual le fue entregada legítimamente por el paramédico. Así, sostiene que la incautabilidad surgió de la percepción del objeto y no de su registro, por lo que aplica por analogía la doctrina de percepción mediante el tacto.

Conforme a lo discutido, en nuestra jurisdicción se permite ocupar un objeto sin orden judicial previa si el

agente estaba legítimamente en una posición en la que pudo percibir la evidencia por alguno de sus sentidos, lo cual incluye la percepción mediante el tacto. Según lo indicamos anteriormente, para que proceda aplicar la excepción señalada debe existir un motivo válido para que la agente estuviera en el lugar desde el cual pudo palpar el objeto e inferir la naturaleza delictiva de éste sin necesidad de manipular o escudriñarlo de forma alguna.

Estimamos que en las circunstancias ante nuestra consideración, aplica la doctrina de percepción mediante el tacto. Los hechos demuestran que la agente del orden público arribó al lugar para atender un accidente de motora que tuvo el señor Báez López. Como parte de sus funciones, la agente tramitó asistencia para ofrecer los primeros auxilios. Al llegar el paramédico, éste le entregó la cartera del señor Báez López para proceder a atenderlo. Una vez la agente recibió la cartera y sintió lo que a su juicio y experiencia era un arma de fuego, procedió a abrir la misma para dar en su interior con el referido objeto. Véase, además, *Moción de supresión de identificación [sic] del acusado*, Apéndice Petición de Certiorari, págs. 4, 7-8.

Lo expuesto, demuestra que la agente del orden público se encontraba legítimamente en el lugar desde donde pudo percibir el objeto. A su vez, ésta advino en contacto con la referida arma de fuego de forma inadvertida cuando el paramédico le entregó la cartera. En ese momento, y no mediante un registro, la agente percibió el arma de fuego.

La naturaleza del objeto surgió por la percepción mediante tacto que tuvo la agente al tocar la cartera. Al abrir la cartera del señor Báez López no hubo una invasión a su privacidad ya que, en efecto, al palpar la cartera la agente advino en conocimiento de la existencia del arma de fuego. En este contexto, no procede la protección constitucional contra un registro sin orden judicial previa. No podemos olvidar que un arma de fuego es un objeto con características particulares a las cuales los agentes del orden público están diariamente expuestos, por lo que indudablemente, como regla general, éstos pueden reconocerlos por la mera percepción del sentido del tacto.

En el caso de autos se produjeron las circunstancias que justifican la aplicación de la doctrina de percepción mediante el tacto, por lo que no procedía la supresión de la evidencia incautada.

V

Por las razones expuestas, se revoca al Tribunal de Apelaciones, y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de acuerdo con lo aquí resuelto.


                              LUIS F. ESTRELLA MARTÍNEZ
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.

                                     CC-2012-461       Certiorari

Octavio Báez López

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 10 de diciembre de 2013.

Por las razones expuestas, se revoca al Tribunal de Apelaciones, y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de acuerdo con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Disidente a la cual se une el Juez Presidente señor Hernández Denton y la Jueza Asociada señora Fiol Matta.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>    Peticionario<br><br>        v.<br><br>Octavio Báez López<br><br>    Recurrido | CC-2012-461 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Fiol Matta

San Juan, Puerto Rico, a 10 de diciembre de 2013

> And, in order to be exercised, this power had to be given the instrument of permanent, exhaustive, omnipresent surveillance, capable of making all visible, as long as it could itself remain invisible.[13]

Disiento enérgicamente de la determinación que hoy anuncia este Tribunal por entender que lejos de impartirle un contenido más abarcador a los derechos que establece nuestra Constitución, la mayoría opta por incorporar innecesariamente a nuestra jurisdicción la doctrina de evidencia obtenida mediante el tacto para validar un registro sin orden judicial. Peor aún, al aplicar los criterios de esta doctrina, la mayoría limita los derechos de los ciudadanos más allá del ámbito mínimo de protección establecido por la jurisprudencia federal en aras de

---

[13] Michel Foucault, *Panopticism*, *Discipline & Punish: The Birth of the Prison* 214 (Alan Sheridan trans., Pantheon 1977) (1975).

validar el registro. Al así proceder, olvidan que "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all". *Arizona v. Hicks*, 480 U.S. 321, 329 (1987).

I

El 5 de octubre de 2011 el Ministerio Público presentó una denuncia contra el señor Octavio Báez López por violación al Art. 5.04 de la Ley de Armas, Ley Núm. 404 de 11 de septiembre de 2000, 25 L.P.R.A. sec. 458c. Específicamente, se le imputó que para la fecha del 30 de mayo de 2011, el señor Báez López portaba ilegalmente una pistola Smith & Wesson negra, calibre .40mm, modelo XDM-40, cargada con una munición en recámara y quince (15) municiones.

Luego de la lectura de acusación, el señor Báez López presentó una moción de supresión del arma de fuego incautada. En síntesis, alegó que conforme al testimonio de la agente Michaida Rivera Alvarado en la vista preliminar, la incautación del arma de fuego se realizó en violación a la protección constitucional contra registros y allanamientos irrazonables. Sostuvo que conforme a los hechos narrados por ésta procedía suprimir el arma de fuego incautada. Según relató la agente Rivera Alvarado, los hechos que dieron base para incautar el arma fueron los siguientes:

El 30 de mayo de 2011 la agente Rivera Alvarado escuchó por la radiocomunicación de la Policía sobre la

ocurrencia de un accidente de motora en la carretera interestatal 174. En ese momento se dirigió al lugar del accidente. Al arribar al lugar, ésta observó a un joven que yacía en el pavimento cerca de una motora accidentada. El joven sangraba por la cabeza, manos y piernas. Describió el estado del joven como aturdido y medio inconsciente. No obstante, no cuestionó al joven para identificarlo o para conocer si le afectaba alguna condición.

Minutos después, los paramédicos arribaron a la escena y ofrecieron los primeros auxilios al joven. Para proceder a prestarle los servicios médicos, el paramédico le removió al joven una cartera color negra, que éste llevaba transversalmente en el pecho. Acto seguido, debido a que en ese momento no se encontraba ningún familiar del joven en la escena, el paramédico procedió a entregarle la cartera a la agente Rivera Alvarado. Cuando ésta recibió la cartera, palpó lo que aparentaba ser un arma de fuego y, sin pedirle autorización al joven, procedió a abrirla. Al abrir la cartera, se percató de que en ésta había un arma de fuego y extrajo lo que resultó ser una pistola Smith & Wesson. Posteriormente, el joven fue trasladado al Hospital Regional. Allí, la agente Rivera Alvarado, luego de leerle las advertencias legales, procedió a entrevistarlo. Cuando le cuestionó sobre la posesión del arma, el joven aceptó que no tenía licencia para portar armas. Ello dio lugar a la acusación contra el señor Báez López por portación ilegal de un arma.

Conforme a estos hechos, el señor Báez López sostuvo su alegato de supresión del arma de fuego. Adujo que la evidencia incautada no estaba a plena vista. Además, señaló que contrario las declaraciones de la agente Michaida Rivera Alvarado en su declaración jurada,[14] en la vista preliminar ésta aceptó que el registro iba dirigido a encontrar material delictivo y no estaba vinculado a la atención de una emergencia ni a la identificación del señor Báez López. Finalmente, sostuvo que la agente no tenía una sospecha individualizada que le permitiera concluir que en el interior de la cartera se transportaba material delictivo sino que mediante el registro trató de validar una sospecha producto de una actuación ilegal.

El Ministerio Público se opuso a la supresión solicitada por el señor Báez López. Señaló que debido a que el señor Báez López estaba en peligro y necesitaba ayuda, se cumplieron los criterios de razonabilidad reconocidos por nuestra jurisprudencia para realizar un registro sin orden judicial en una situación de emergencia. Además, arguyó que el señor Báez López transitaba en una motora, cuya expectativa de intimidad es menor que cuando se transita en un automóvil. Luego de la vista de supresión de evidencia, el 1 de febrero de 2012 el Tribunal de Primera Instancia declaró con lugar la moción de supresión de evidencia.

---

[14] En la declaración jurada la agente Rivera Alvarado sostuvo que procedió a "abrir la cartera [sic] para tratar de localizar una tarjeta de identificación con foto del joven, y me percaté que en el interior de la misma había una arma de fuego".

El foro de instancia razonó que según el testimonio de la agente Rivera Alvarado y el paramédico Carlos Rosado Erazo en la vista de supresión, no se configuraron las circunstancias para realizar un registro sin orden judicial en una situación de emergencia. En la vista la agente aceptó que el señor Báez López no estaba inconsciente. Además, indicó que éste respondía a preguntas de los paramédicos. Sostuvo que la agente, para justificar la búsqueda en la cartera, indicó que intentaba encontrar alguna identificación, pero en la vista aceptó que el propósito del registro fue la curiosidad de encontrar el arma de fuego. Por tanto, concluyó que de la agente haber tenido sospecha fundada sobre la existencia de un arma, procedía dejar la cartera en custodia con otro agente y solicitar una orden de registro.

En desacuerdo con esta determinación, el Ministerio Público acudió ante el Tribunal de Apelaciones mediante recurso de *certiorari*. En síntesis, sostuvo que erró el foro primario al suprimir la evidencia por razón de que no hubo una orden judicial previa, esto a pesar de que se trataba de un registro válido mediando una situación de emergencia. Alegó que la expectativa de intimidad de un motociclista herido es limitadísima y que el accidente justificó el registro de emergencia como mecanismo dirigido a identificar al herido. Esta vez, sin embargo, sostuvo que aún si no hubiese mediado una situación de emergencia, procedía el registro sin orden toda vez que el agente percibió mediante el tacto que había un objeto que

aparentaba ser un arma de fuego, con lo cual la agente tenía una sospecha individualizada de que en el interior de la cartera había un arma de fuego, lo que validaba el registro sin orden judicial.

Mediante Resolución emitida el 29 de marzo de 2012, el foro apelativo intermedio denegó el recurso de certiorari presentado por el Ministerio Público. Razonó que a la luz de los hechos de este caso no se configuró una situación de emergencia que permitiera el registro sin orden judicial. Además, sostuvo que si la agente Rivera Alvarado tenía motivos fundados para creer que el señor Báez López estaba cometiendo un delito en su presencia, procedía ponerlo bajo arresto antes de realizar el registro.

Inconforme, el Ministerio Público solicitó reconsideración ante el Tribunal de Apelaciones. Esta vez sostuvo que la agente realizó el registro partiendo de la creencia razonable de que estaba ante una situación de emergencia. Sin embargo, en la reconsideración sostuvo que es inmaterial si hubo o no una situación de emergencia. Una vez la agente palpó un objeto que aparentaba ser un arma de fuego en el interior de la cartera se generó una sospecha individualizada y razonable que validó el registro de la cartera debido a que el arma es un objeto inherentemente peligroso y altamente regulado por el Estado. Sostuvo además que, independientemente de la situación de emergencia, el descubrimiento de la pieza delictiva era inevitable toda vez que como cuestión de protocolo del paramédico, éste debía preparar un recibo de

propiedad, excepción al registro con orden judicial.  El Tribunal de Apelaciones declaró no ha lugar la solicitud de reconsideración.

En desacuerdo con la determinación del foro apelativo intermedio, el Ministerio Público acudió ante este Tribunal mediante recurso de *certiorari*.  Reiteró los argumentos presentados en la moción de reconsideración ante el Tribunal de Apelaciones.  El 4 de junio de 2012, expedimos el recurso ante nuestra consideración.

II

A

La Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico establece el derecho de todo ciudadano a la protección sobre sus casas, papeles y efectos personales contra registros, incautaciones y allanamientos irrazonables. Const. PR Art. II Sec. 10.  El propósito de este precepto constitucional es proteger el derecho a la intimidad de las personas y la dignidad del individuo frente a las actuaciones arbitrarias e irrazonables del Estado. *Pueblo v. Yip Berríos*, 142 D.P.R. 386, 397 (1997); *Pueblo v. Ramos Santos*, 132 D.P.R. 363, 370 (1992).

Esta disposición constitucional es análoga a la Enmienda IV de la Constitución de los Estados Unidos, Const. EEUU Enmd. IV. *Pueblo v. Yip Berríos*, 142 D.P.R. en la pág. 397; *véase además* 3 Diario de Sesiones de la Convención Constituyente 1568 (1961); 3 José Trías Monge, Historia Constitucional de Puerto Rico 191 (1982).  No

obstante, en el pasado hemos reconocido que la disposición en la Constitución federal sólo establece el ámbito mínimo de protección, por lo que tanto los estados como Puerto Rico pueden ampliar esta garantía constitucional con el propósito de conceder mayores protecciones a la ciudadanía. *Pueblo v. Yip Berríos*, 142 D.P.R. en la pág. 397-398. [15]

Como bien reconoce una mayoría de este Tribunal, a diferencia de la Constitución federal, nuestra Constitución expresamente limita el uso que se le puede otorgar a una evidencia incautada mediante un registro irrazonable sin orden judicial previa. Es decir, como regla general, nuestro ordenamiento requiere que se obtenga una orden judicial previo a que se realice un registro. *Pueblo v. Malavé González*, 120 D.P.R. 470, 477 (1988). Consecuentemente, todo registro o incautación sin orden judicial se presume irrazonable y, por tanto, inválido. *Pueblo v. Serrano Reyes*, 176 D.P.R. 437, 447 (2009).[16]

---

[15] A propósito, en *Pueblo v. Bonilla*, 149 D.P.R. 318, 329 (1999), señalamos que: "[a] pesar de que la protección contra registros y allanamientos se encuentra redactada en idénticos términos en ambas Constituciones, por gozar nuestra Constitución de una 'vitalidad independiente', podemos darle a la garantía un contenido distinto y mayor. Esto es, podemos interpretarla de forma más beneficiosa al acusado".

[16] La Regla 234 de las de Procedimiento Criminal establece que la evidencia obtenida en violación a la garantía constitucional contra registros, incautaciones y allanamientos irrazonables, será suprimida y no será admisible en los tribunales como prueba de la comisión de un delito. 34 L.P.R.A. Ap. II, R. 234. Según el profesor Ernesto L. Chiesa Aponte, esta norma de exclusión persigue varios propósitos importantes, a saber: (1) provee un remedio efectivo a la víctima del registro y allanamiento irrazonable o ilegal; (2) evita que el gobierno se beneficie de sus propios actos ilegales; (3) preserva la integridad del Tribunal; y (4) disuade a los oficiales del

Para que se active la protección contra registros irrazonables lo primero que debe determinarse es si en efecto hubo un registro. *Pueblo v. Bonilla*, 149 D.P.R. 318, 329 (1999). Así, hemos sostenido que "se entiende que ha ocurrido un registro cuando se infringe la expectativa de intimidad que la sociedad está preparada a reconocer como razonable". *Pueblo en el interés del menor N.O.R.*, 136 D.P.R. 949, 961-962 (1994). Esto es, el ciudadano debe albergar una expectativa de intimidad y que la sociedad esté dispuesta a aceptar que dicha expectativa es razonable. Por tal razón, hemos señalado que la protección constitucional se refiere a aquella propiedad sobre la cual la persona tenga una expectativa de intimidad, y protege tanto al sospechoso u ofensor como al inocente. *Pueblo v. Miranda Alvarado*, 143 D.P.R. 356, 363 (1997).

En *Pueblo v. Yip Berríos,* 142 D.P.R. en la pág. 399, sostuvimos que el criterio para determinar si la actuación gubernamental es constitucionalmente permisible *vis-à-vis* la expectativa de intimidad del ciudadano, es la razonabilidad de la intrusión estatal con la intimidad de la persona. Añadimos que:

> [E]sto normalmente se determina balanceando los intereses del Estado frente a los derechos individuales. El menor o mayor grado de expectativa a la intimidad que nuestro ordenamiento le reconoce a una persona en determinada circunstancia es pertinente para el análisis acerca de la razonabilidad de la actuación gubernamental y en consecuencia para

orden público a que en el futuro no repitan las acciones objeto de impugnación. Ernesto L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, 284-285 (Ed. Forum, 1991).

determinar el alcance de la protección constitucional. En este contexto, y dado que en Puerto Rico los derechos individuales y particularmente el derecho a la intimidad y dignidad reciben una protección más amplia que en la jurisdicción federal, en **nuestra jurisdicción el criterio de razonabilidad es más estricto.**

*Id.* en la pág. 399 (énfasis nuestro).

B

Si bien en nuestro ordenamiento todo registro sin orden se presume inválido, hemos reconocido excepciones limitadas y específicas a la presunción de invalidez. En *Pueblo v. Miranda Alvarado*, 143 D.P.R. 356, 363 fn. 3 (1997), señalamos que hemos validado las siguientes excepciones:

(1) registro y allanamiento de estructuras abandonadas;

(2) registro de evidencia abandonada o arrojada por la persona;

(3) registro incidental al arresto, cuando el área registrada está al alcance inmediato del sujeto y el propósito es ocupar armas o instrumentos que puedan ser utilizados por la persona arrestada para agredir a los agentes del orden público, o para intentar una fuga o evitar la destrucción de evidencia;

(4) cuando la evidencia se encuentra a plena vista [o cuando un agente del orden público adviene en conocimiento de material delictivo por el olfato];

(5) campo abierto;

(6) cuando circunstancias de emergencia así lo requieran;

(7) registro tipo inventario, que sea realizado para salvaguardar el contenido del vehículo y proteger a la Policía así como al dueño del vehículo;

(8) cuando la evidencia es obtenida durante el transcurso de una persecución;

(9) evidencia obtenida durante un registro administrativo en una actividad altamente reglamentada por el Estado; y

(10) cuando el registro es consentido directa o indirectamente.

*Pueblo v. Miranda Alvarado*, 143 D.P.R. 356, 363 fn. 3 (1997) (citas omitidas).[17]

En todas estas circunstancias se ha reconocido que no existe una expectativa razonable de intimidad, por ende, no hay protección constitucional que salvaguardar.

III

A

Hoy una mayoría de este Tribunal determina correctamente que en este caso no se configuraron los criterios para que aplique la excepción al requisito de una orden judicial cuando media una situación de emergencia. En este caso, la agente Rivera Alvarado no podía albergar la creencia razonable de que estaba ante una emergencia; el señor Báez López estaba consciente y podía haber sido interrogado para conocer su identidad antes de proceder a abrir la cartera. Además, en la vista preliminar la agente reconoció que la intención de abrir la cartera fue la "curiosidad" por encontrar material delictivo y no para dar con una identificación del señor Báez López, según había sostenido en su declaración jurada. Coincidimos, a su vez, con la determinación de una mayoría de este Tribunal al señalar que en este caso no procedía la excepción de descubrimiento inevitable al

---

[17] Añádase a las excepciones mencionadas, la reconocida por una mayoría de este Tribunal *en Pueblo v. Díaz, Bonano*, 176 D.P.R. 601 (2009) sobre la evidencia obtenida en un lugar público como resultado de la utilizacón de canes para olfatear.

realizarse un recibo de propiedad. El Estado no demostró que existiese un procedimiento rutinario que inevitablemente hubiese permitido el descubrimiento del arma de fuego incautada.

No obstante a lo anterior, ausente de argumentos para sostener la razonabilidad de un registro que a todas luces incumple con las garantías mínimas consagradas en nuestra Constitución, hoy una mayoría de este Tribunal adopta innecesariamente la doctrina de evidencia incautada mediante el sentido del tacto, "plain touch/plain feel", reconocida por el Tribunal Supremo de los Estados Unidos en *Minnesota v. Dickerson,* 508 U.S. 366 (1993), como excepción a la presunción de ilegalidad de un registro sin orden. En el proceso olvidan que nuestra Constitución, que tantas veces hemos señalado es de factura más ancha, — aunque en tiempos recientes tal contención se encuentre exigua por la desmemoria del Tribunal— exige que en aras de proteger el derecho a la intimidad y dignidad de los ciudadanos, seamos guardianes de tales garantías al evaluar los criterios y las circunstancias para permitir un registro sin orden judicial. Más grave aún, una vez adoptan la nueva excepción, la aplican erróneamente. Veamos entonces.

B

En *Terry v. Ohio,* 391 U.S. 1 (1968), el Tribunal Supremo de los Estados Unidos determinó que un agente de la policía puede detener a una persona sospechosa y, por la seguridad del agente, someterla a un cateo o registro

superficial para detectar armas, aun ausente de causa probable para arresto. Cabe señalar que, al día de hoy, la doctrina desarrollada en *Terry* no ha sido adoptada por este Tribunal. Precisamente, al amparo de la doctrina de *Terry*, en *Minnesota v. Dickerson*, 508 U.S. 366 (1993), un oficial de la policía detuvo a un sujeto que entendió se comportaba de manera sospechosa y procedió a realizarle un cateo o registro superficial para detectar si tenía armas. Al realizar el registro superficial, el oficial no encontró armas. Sin embargo, sintió curiosidad por un pequeño abultamiento que tenía el ciudadano en uno de los bolsillos de la chaqueta que llevaba puesta. Al palpar el abultamiento, sintió lo que aparentaba ser una bolsa de "crack". Por tal razón, procedió a registrarlo y, efectivamente, encontró una bolsa de "crack".

El Tribunal Supremo federal sostuvo que conforme a *Terry*:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

*Dickerson*, 508 U.S. en las págs. 375-376.

Como se puede apreciar en la cita anterior, en su análisis el Tribunal Supremo federal adoptó la excepción de evidencia incautada mediante el sentido del tacto o "plain touch/plain feel" como corolario de la doctrina de

evidencia a plena vista.   Al tiempo en que descartó el
argumento sostenido por el Tribunal Supremo de Minnesota de
que la evidencia obtenida mediante "plain touch/plain feel"
es menos confiable y más invasiva que la evidencia a plena
vista y, por tanto, violaba el derecho a la intimidad de
las personas.[18]   Para que se cumpla con la excepción de
"plain touch/plain feel" deben estar presentes los mismos
requisitos de evidencia incautada mediante la excepción de
plena vista, según reconocido en *Coolidge v. New Hampshire*,
403 U.S. 443 (1971).   Por tal razón, el Tribunal señaló que
en *Dickerson* no procedía el registro toda vez que el agente
tuvo que escudriñar el bulto para palpar la evidencia
incautada y, por ende, la naturaleza delictiva de la
evidencia no era aparente de su faz.

Esta doctrina ha sido criticada en distintos artículos
de revistas jurídicas por las implicaciones que tiene sobre
el derecho a la intimidad de las personas y por el riesgo
de que los agentes de la policía abusen de su poder y
pretendan establecer que la naturaleza delictiva de la
evidencia era inmediatamente aparente cuando en realidad no
lo era. *Véase* John A. Cecere, *Searches Woven From* Terry

---

[18] Para descartar el argumento de que la evidencia obtenida
mediante el sentido del tacto es menos confiable que la
evidencia a plena vista, el Tribunal Supremo federal se
limitó a señalar que: "[e]ven if it were true that the
sense of touch is generally less reliable than the sense of
sight, that only suggests that officers will less often be
able to justify seizures of unseen contraband". *Dickerson,*
508 U.S. en la *pág.* 376.   En cuanto a que ésta es más
invasiva a la privacidad, sostuvo que:   "is inapposite in
light of the fact that the intrusion the court fears has
already been authorized by the lawful search for weapons".
*Dickerson,* 508 U.S. en las *págs.* 376-377.

*Cloth: How the Plain Feel Doctrine Plus* Terry *Equals Pretextual Search,* 36 B.C. L. Rev. 125 (1994); Eric B. Liebman, *The Future of the Fourth Amendment After Minnesota v. Dickerson - A "Reasonable" Proposal,* 44 Depaul L. Rev. 167 (1994); David L. Haselkorn, *The Case against a Plain Feel Exception to the Warrant Requirement*, 54 U. Chi. L. Rev. 683 (1987). De hecho, previo a *Dickerson*, además del Tribunal Supremo de Minnesota, el Tribunal Supremo de Nueva York, *People v. Diaz,* 81 N.Y.2d 106 (1993), y el Tribunal Supremo de Washington, *State v. Broadnax*, 98 Wash. 2d 289 (1982), se negaron a reconocer la excepción de la evidencia encontrada mediante el sentido del tacto como corolario de la excepción de plena vista, precisamente por las implicaciones que tenía en el derecho a la intimidad de las personas y la poca confiabilidad del sentido del tacto. Por tanto, debido a que hoy una mayoría de este Tribunal adopta esta excepción, considerada análoga a la evidencia obtenida a plena vista, procede que, como mínimo, evaluemos con suma mesura los requisitos establecidos en *Dickerson* a la luz de la controversia ante nosotros, tomando en consideración las advertencias ante señaladas a la excepción de evidencia obtenida mediante el tacto.

IV

A

Según sostiene una mayoría de este Tribunal, para que aplique la excepción de evidencia obtenida mediante el tacto se requiere que:

(1) el objeto sea descubierto por haber sido palpado y no por razón de su registro;

(2) exista una justificación legal para que el agente esté en el lugar desde donde pudo entrar en contacto con la evidencia;

(3) el oficial del orden público advino en contacto con la evidencia de forma inadvertida; y

(4) **la naturaleza delictiva del objeto surge inmediata y razonablemente a través del sentido del tacto** sin que el agente pueda manipular o escrudiñar de forma alguna éste.

Opinión mayoritaria, en la pág. 28 haciendo referencia a K.W. Inverson, *"Plain Feel": a Common Sense Proposal Following State v. Dickerson*, 16 Hamline L. Rev. 247, 277-278 (1992-1993).

En otras palabras, aplican los requisitos reconocidos para evidencia obtenida a plena vista, adecuados a la percepción mediante el tacto. Considerando estos requisitos adoptados por la mayoría así como la propia jurisprudencia federal citada con aprobación, una lectura objetiva y sin ánimo prevenido, deja claro que en este caso es imposible que, mediante el tacto, la agente haya podido percibir inmediatamente la naturaleza delictiva del arma de fuego incautada. Veamos.

En *Arizona v. Hicks*, 480 U.S. 321 (1987), el Tribunal Supremo federal, al evaluar los requisitos de evidencia obtenida a plena vista, tuvo la oportunidad de abordar el requisito de que la naturaleza delictiva del objeto surja inmediatamente de la simple observación. En *Hicks*, en el curso de un registro para dar con el sospechoso de un tiroteo en un apartamento, uno de los agentes se percató de que en el apartamento había unas bocinas que éste sospechaba que eran robadas. El agente procedió a voltear

las bocinas para verificar el número de serie. Al conocer el número de serie, constató con el cuartel que en efecto las bocinas habían sido robadas. Por estos hechos, al señor Hicks se le acusó del delito de robo.

Al resolver esta controversia, el Tribunal Supremo federal sostuvo que la incautación del sistema de bocinas hurtadas mientras la policía realizaba un registro para encontrar otra evidencia era inválida, toda vez que para conocer la ilegalidad de las bocinas el agente tuvo que voltearlas para leer el número de serie. Según el Tribunal, luego de voltear las bocinas, acto que constituyó un registro, fue que el oficial tuvo conocimiento de la naturaleza delictiva de las bocinas, no obstante a que el agente tenía una sospecha razonable de que las bocinas habían sido hurtadas. Añadió que "the 'distinction between *looking* at a suspicious object in plain view and *moving* it even a few inches' is much more than trivial for purposes of the Fourth Amendment". *Hicks*, 480 U.S. en la pág. 325.

Previo a la determinación del Tribunal Supremo federal en *Hicks*, el Tribunal de Apelaciones de los Estados Unidos para el Sexto Circuito tuvo la oportunidad de evaluar un caso similar a *Hicks* pero en relación a la incautación de unos rifles en el curso de una orden de registro e incautación de bebidas alcohólicas. *U.S. v. Gray*, 484 F.2d 352 (6to Cir. 1973). Allí el foro apelativo federal sostuvo que si bien los agentes estaban autorizados a estar en lugar donde estaban y habían advenido con los rifles inadvertidamente, la naturaleza delictiva de los mismos no

era inmediatamente aparente. Una vez el agente copió el número de serie de los rifles y comprobó que habían sido robados, entonces se percató de la naturaleza delictiva de los mismos. *Id.* Por tal razón, concluyó que el registro e incautación de los mismos fue inválido.[19]

Posteriormente, en *U.S. v. Szymkowiak*, 727 F.2d 95 (6to Cir. 1984), el propio Tribunal de Apelaciones de los Estados Unidos para el Sexto Circuito, sostuvo que un arma percibida a simple vista mientras se efectuaba un registro en una casa por otra evidencia, no era suficiente para sostener la naturaleza delictiva inmediata del arma de fuego. El foro apelativo federal sostuvo que "[t]he record in [*Szymkowiak]* is clear that the executing officers who discovered the weapon could not 'at the time' of discovery determine whether its possession was unlawful". *Szymkowiak*, 727 F.2d en la pág. 99. Así, citando con aprobación a *Gray*, sostuvo que a pesar de que se percibió un arma de fuego, la naturaleza **delictiva** del arma no era aparente. *Id.* en la pág. 97.

A la misma conclusión llegó el Tribunal de Apelaciones de Florida en *Ray v. State*, 634 So.2d 695 (Fla.

---

[19] En *U.S. v. Truitt*, 521 F.2d 1174 (6to. Cir. 1975), el foro apelativo distinguió los hechos de *Gray* para sostener la validez del registro e incautación de una escopeta con los cañones recortados. Según *Truitt*, en ese caso la escopeta con los cañones recortados en sí misma daba cuenta de la probabilidad de su naturaleza delictiva. Para llegar a tal conclusión, sostuvo que la escopeta con los cañones recortados no es un arma comúnmente utilizada y consideró las circunstancias concomitantes al registro mediante orden.

App. 1994). El foro apelativo intermedio de Florida sostuvo

lo siguiente:

> In the present case, the discovery of the pistol was a lawful consequence of the authorized search which brought the pistol within the plain view of Officer Carroll. However, **the incriminating character of the pistol was not immediately apparent to Officer Carroll because its defaced serial number could not be seen by the officer until he picked up the pistol and turned it over. In picking up the pistol and turning it over Officer Carroll extended the search beyond the scope permitted by the warrant.**

*Ray*, en la pág. 696.[20]

Conforme a lo anterior, evaluemos entonces nuestro

ordenamiento estatutario respecto a las armas y la

aplicación del marco jurídico reseñado a los hechos de este

caso.

B

En Puerto Rico la Ley de Armas establece que el

Superintendente de la Policía "expedirá una licencia de

armas **a cualquier peticionario**" que cumpla con una serie de

requisitos. 25 L.P.R.A. sec. 456a. Entre éstos, ser

ciudadano de los Estados Unidos o residente legal de Puerto

Rico; haber cumplido veintiún (21) años de edad; tener un

certificado de antecedentes penales expedido no más de

treinta (30) días previo a la fecha de la solicitud; no ser

acusado o estar en proceso de juicio por violar la licencia

especial de armas largas y municiones; no ser ebrio

---

[20] Conviene señalar que los casos anteriormente reseñados versan sobre evidencia obtenida a plena vista, sentido más confiable que el del tacto, como bien consideró el Tribunal Supremo federal en *Dickerson*. *Dickerson,* 508 U.S. en la pág. 376.

habitual, adicto a sustancias controladas o haber sido declarado incapaz mental por un tribunal; y presentar una (1) declaración jurada de tres (3) personas que no tengan relación de consanguinidad o afinidad con el peticionario que atestigüen que el peticionario goza de buena reputación en su comunidad; entre otros. 25 L.P.R.A. sec. 456a(a).

A su vez, la Ley establece que "[l]as armas de fuego **se podrán portar, conducir y transportar de forma oculta o no ostentosa**". 25 L.P.R.A. sec. 456a(d)(1); *véase además Reglamento de la Ley Núm. 404 de 11 de septiembre de 2000, según enmendada, conocida como la "Ley de Armas de Puerto Rico"*, Reglamento de la Policía de Puerto Rico Núm. 7311 de 5 de marzo de 2008. En tal caso, el concesionario sólo podrá portar un (1) arma de fuego a la vez. 25 L.P.R.A. sec. 456a(d)(4). Por su parte, en la sección 458c de la Ley de Armas se establece que para que una persona se encuentre incursa en violación de dicha disposición se requiere que la persona "**transporte cualquier arma de fuego. . .sin tener una licencia de armas**, o porte cualquier arma de fuego **sin tener su correspondiente permiso para portar armas**". 25 L.P.R.A. sec. 458c. Es decir, el elemento del delito requiere que (1) la persona transporte un arma de fuego y (2) no tenga una licencia de armas o un permiso para portar armas.

Si aplicamos las disposiciones de la Ley a los hechos de este caso, notamos que al momento en que el agente efectuó el registro sin orden judicial sobre la cartera del señor Báez López, éste no pudo haber percibido

inmediatamente la naturaleza delictiva del arma de fuego incautada. La cartera estaba cerrada, y conforme a la Ley, un arma de fuego mientras se porte o transporte de forma oculta o no ostentosa, de su faz no constituye un delito. [21]

De otra parte, al momento en que la agente palpó lo que en su experiencia entendió era un arma de fuego, no sabía si el señor Báez López poseía una licencia para portar armas de fuego. Tampoco indagó o cuestionó al señor Báez López para saber si éste tenía licencia para portar armas de fuego cuando palpó lo que en su creencia era un arma de fuego. No es hasta que el señor Báez López es trasladado al hospital, tiempo después de que la agente efectuara el registro sobre la cartera, cuando la agente cuestionó al joven sobre el arma y éste le notificó que no poseía licencia para portarla. Fue en ese momento en que la agente advino en conocimiento de la naturaleza delictiva del arma de fuego.

Cabe señalar que en *Dickerson*, a diferencia de este caso, existía una sospecha individualizada sobre la persona a raíz de un registro superficial conforme a *Terry*. Adviértase que la incautación de armas mediante un registro superficial bajo la doctrina de *Terry* se fundamenta en la protección y seguridad de los agentes y no en que el arma de su faz es un objeto ilegal. Esto es, debido a que

---

[21] En relación a la expectativa de la intimidad sobre la cartera, como bien reconoce una mayoría de este Tribunal, no hay duda de que el señor Báez López tenía una expectativa de intimidad razonable reconocida por nuestra sociedad sobre ésta. Por tanto, no entraremos a la discusión sobre ese asunto.

cuando un agente realiza un registro superficial autorizado por *Terry* se tiene sospecha sobre la comisión de un delito y el sospechoso pudiese estar armado, se permite que los agentes verifiquen si la persona está armada y, en ese registro, *Dickerson* permitió el registro de material delictivo perceptible al tacto.[22] Por tanto, la incautación de un arma de fuego que después de un registro superficial resulta ser ilegal está autorizada precisamente por el registro sobre un sospechoso que autoriza *Terry*.

En este caso la cadena de eventos que concluyó en el registro de la cartera se inició con un accidente de tránsito. No estamos ante hechos en que hubiese una sospecha individualizada sobre el señor Báez López o en una investigación en curso sobre la posible comisión de un delito. Tampoco podemos concluir que el agente se encontraba ante una situación en que tuviese que velar por su seguridad o su protección que lo incitara a tener que registrar la cartera, esto mientras el señor Báez López estaba siendo atendido por paramédicos. Valga señalar que el señor Báez López, como bien reconoció la agente, estaba consciente al momento en que registró la cartera. Es decir, la agente pudo solicitar la autorización del señor

---

[22] El Tribunal Supremo federal lo resumió de esta manera: **"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context"**. *Dickerson*, 508 U.S. en la pág. 375-376.

Báez López para abrir la cartera; pudo indagar al señor Báez López sobre lo que en su creencia era un arma de fuego; y más aún, pudo solicitar, conforme al mandato constitucional, una orden de registro.

C

No obstante a lo anterior, hoy una mayoría sostiene que procedía el registro de la cartera y la incautación del arma de fuego por haberse cumplido los requisitos de la excepción de evidencia obtenida mediante el tacto. Si bien coincidimos en que el agente estaba autorizado a estar donde estaba y advino en conocimiento de lo que en su creencia y experiencia era un arma de fuego, entendemos que al evaluar el requisito de que la naturaleza delictiva del objeto surja inmediatamente por medio del sentido del tacto, la mayoría va más allá del ámbito mínimo de protección establecido por la jurisprudencia federal. En otras palabras, en este caso la mayoría actúa en contravención a lo resuelto por el Tribunal Supremo federal en *Dickerson*. Y lo hace, no para reconocerle a un ciudadano un marco más amplio de la protección constitucional bajo nuestra Constitución — lo que sabemos es perfectamente válido — sino que actúa para restringir los derechos más allá de lo permitido en *Dickerson*. **La mayoría se coloca al margen de la Constitución de los Estados Unidos** conforme a lo interpretado por el foro judicial más alto de ese País. Explicamos.

Para la mayoría, a diferencia de lo establecido en la jurisprudencia federal, basta con que el objeto sea un arma de fuego para que se active la inmediatez de la naturaleza delictiva del objeto. Sostienen que si un agente palpa lo que aparenta ser un arma de fuego, ello es suficiente para que proceda a realizar un registro sin orden judicial, a pesar de que de su faz el agente no sabía ni pudo saber que el arma se poseía ilegalmente; esto es, que la naturaleza del objeto era delictiva.[23] Es decir, palpar lo que en su experiencia era un arma de fuego, la cual se encontraba oculta dentro de una cartera, no es suficiente para que la agente pudiese establecer, **inmediatamente**, la naturaleza delictiva del objeto.

El criterio no es que el agente pueda identificar el objeto como sostiene la mayoría, sino que pueda identificar el objeto mediante el tacto y tenga la creencia **inmediata de que es un objeto ilegal.** Precisamente en *Dickerson*, el Tribunal Supremo federal puntualizó que "[r]egardless of whether the officer detects the contraband by sight or by touch, however, **the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it** ensures against excessively speculative seizures". *Dickerson,* 508 U.S. en la pág. 376. Un arma de fuego en sí misma no se considera contrabando pues, como señalamos, en nuestra jurisdicción, por ejemplo,

---

[23] Particularmente, ante el arma incautada en este caso, una Smith & Wesson, calibre .40, cuya obtención no está sujeta a los requisitos, por ejemplo, para las armas de asalto, 24 L.P.R.A. sec. 456, y calibre comúnmente utilizado por portadores de armas de fuego en Puerto Rico.

se permite su portación por cualquier ciudadano que cumpla con ciertos criterios razonables de solicitud de portación, siempre y cuando el arma se porte de manera oculta y no ostentosa. Consecuentemente, no tenemos duda de que la premisa inarticulada por la mayoría contraviene las garantías mínimas establecidas en la jurisprudencia federal, jurisprudencia que la mayoría cita con aprobación.

Adviértase que en la opinión mayoritaria no se mencionan los fundamentos para sostener que basta con que se palpe un arma de fuego para cumplir con los requisitos de la excepción de evidencia obtenida mediante el tacto. Sólo se menciona que la agente percibió un arma de fuego dentro de una cartera y, según la mayoría, ese acto de por sí basta para que se cumpla con el requisito de que la naturaleza delictiva del objeto sea inmediata. Esta premisa, sin más, parece estar fundamentada en la determinación de este Foro en *Pueblo v. Del Río*, 113 D.P.R. 684 (1982). Allí nos enfrentamos al planteamiento del señor Héctor Gerardino Del Río, quien fue acusado de portación ilegal de un arma de fuego, de que los agentes no tenían motivos para arrestarlo ya que portar un arma de fuego a plena vista no le da derecho a un agente de la policía a intervenir con él. *Del Río*, 113 D.P.R. en la pág. 688. Al interpretar la Ley de Armas entonces vigente, la Ley Núm. 17 de 19 de enero de 1951, 25 L.P.R.A. secs. 411-454 (derogada), sostuvimos que era innecesario la discusión sobre este asunto ya que:

> [E]n la etapa del juicio, '[e]n casos de portación o posesión ilegal de armas de fuego el fiscal no viene obligado a probar que el acusado no tenía licencia con tal fin, cuando se ha alegado tal hecho en la acusación y se ha probado la portación o posesión del arma, ya que en ellos surge la presunción de portación ilegal y es al acusado a quien incumbe destruir tal presunción.

*Id.* en las págs. 688-689.

Para apoyar esta contención añadimos lo siguiente:

> Es sumamente importante que mantengamos presente el hecho de que en nuestra jurisdicción la posesión y/o portación de un arma de fuego **no es un derecho y sí un privilegio;** en otras palabras, es una 'actividad' **controlada o restringida por el Estado.** Sobre este punto no hay que abundar mucho; **ello surge con meridiana claridad de una simple lectura de las disposiciones de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951,** según enmendada. 25 L.P.R.A. secs. 411-454.

*Del Río,* 113 D.P.R. en la pág. 689.

Ahora bien, hay varios señalamientos que deben realizarse sobre nuestros pronunciamientos en *Del Río,* 113 D.P.R. 684. En primer lugar, según los hechos en *Del Río,* los agentes se ubicaron en el edificio donde pudieron observar al señor Del Río tras recibir una llamada telefónica que apuntaba a la posible captura de uno de los prófugos más buscados en Puerto Rico. Cuando el señor Del Río y un acompañante salieron del mismo edificio que observaban los agentes, éstos se percataron de que tanto el señor Del Río como su acompañante llevaban armas de fuego. El señor Del Río y su acompañante procedieron a montarse en un vehículo. Momentos después, los agentes se acercaron al vehículo del señor Del Río, se identificaron como agentes del orden público y solicitaron al señor Del Río que

detuviera el vehículo. En ese instante, se le preguntó si éste tenía licencia para portar el arma de fuego.

Cuando el señor Del Río aceptó que no poseía licencia para portar armas de fuego, el agente le notificó que estaba bajo arresto y procedió a realizar el registro. Por estos hechos fue acusado de portación ilegal de armas de fuego. Los hechos de *Del Río* claramente se distinguen de los hechos en el caso ante nuestra consideración. En este caso, la agente atendía un accidente de tránsito ordinario. No es hasta que la agente llega al hospital que le preguntó al señor Báez López si poseía licencia para portar armas de fuego. En ese momento ya se había registrado la cartera del señor Báez López. Tampoco la agente realizaba una investigación sobre un sospechoso o la comisión de un delito.

Además, en *Del Río* se interpretó la Ley de Armas aprobada en el año 1951, Ley que fue aprobada a raíz de los sucesos ocurridos el 30 de octubre de 1950 cuando se intentó derrocar el gobierno mediante el uso de armas de fuego. Informe P. de la C. 3447, Comisión de lo Jurídico Penal de la Cámara de Representantes de Puerto Rico, pág. 4. Por razón de los eventos ocurridos durante el 30 de octubre de 1950, esta legislación limitó significativamente la posibilidad de que un ciudadano común pudiese obtener una licencia para la portación armas de fuego. En esencia, el Artículo 20 de la Ley limitaba el uso de armas de fuego a un reducido número de funcionarios de gobierno, entre éstos: los miembros de las fuerzas

armadas, los miembros de la Policía y jueces y fiscales. 25 L.P.R.A. sec. 430 (derogada).

En caso de que un ciudadano interesara solicitar un arma de fuego, sólo podía poseerla **en su domicilio** y si demostraba, a juicio del tribunal, que estaba en peligro de muerte o grave daño corporal. 25 L.P.R.A. sec. 431 (derogada). Por tanto, cobra particular importancia el hecho de que en *Del Río* el arma estaba a simple vista, acto que en sí mismo levantaba sospecha de la comisión de un delito. Consecuentemente, se validó la evidencia incautada percibida mediante el sentido de la vista. Según reseñado, esto contrasta con la Ley de Armas vigente y los requisitos para solicitar la portación de armas de fuego.

Desde entonces, al interpretar la Ley de Armas de 1951, este Tribunal ha repetido la norma establecida en *Del Río*. *Véase Rivera Pagán v. Supte. Policía de P.R.*, 135 D.P.R. 789 (1994); *Pueblo v. Corraliza Collazo*, 121 D.P.R. 244 (1988). No obstante, a partir de la aprobación de la nueva Ley de Armas y del desarrollo en la jurisprudencia federal sobre la portación y posesión de armas de fuego, no nos hemos expresado sobre nuestros pronunciamientos en *Del Río*.[24]

---

[24] Cabe señalar que nuestros pronunciamientos en *Del Río* están sujetos a la evaluación y discusión de este Tribunal sobre las determinaciones recientes del Tribunal Supremo federal de reconocer el derecho de poseer y portar armas como uno fundamental, *District of Columbia v. Heller*, 554 U.S. 570 (2008), y, posteriormente, extender la aplicabilidad de este derecho a los estados, *McDonald v. Chicago*, 561 U.S. 3025 (2010). Adviértase que en *Del Río* sostuvimos que en Puerto Rico poseer y portar un arma es un

Somos del criterio que conforme a la Ley de Armas vigente ——y la jurisprudencia federal citada en apoyo—— la mera portación de un arma, transportada de forma oculta y no ostentosa como establece la Ley, no crea de su faz una presunción de ilegalidad o de contrabando, como parecía crear la legislación anterior al momento en que decidimos *Del Río*. Por tanto, no podemos avalar que la interpretación sobre esta legislación descanse, sin análisis ulterior, en nuestros pronunciamientos sobre una legislación derogada. En particular, para determinar si en este caso se establecieron las excepciones para realizar un registro sin orden judicial, excepciones en las que subyace la protección al derecho a la intimidad.

Por ejemplo, en *Commonwealth v. Cruz*, 459 Mass. 459 (2011), el Tribunal Supremo de Massachusetts, al evaluar la evidencia incautada mediante una detención y registro de un vehículo, sostuvo que, con la aprobación de la nueva legislación que despenalizaba el consumo de una onza de marihuana, y contrario a lo que había reconocido ese foro previo a la nueva legislación, el olor a marihuana por sí solo no era suficiente para generar los motivos fundados para realizar un registro.

Por tanto, a pesar de que la posesión de más de una onza continuaba siendo material delictivo, añadió que la sospecha levantada debía ser sobre material delictivo y no sobre una infracción civil. A tales fines, sostuvo que:

privilegio, no un derecho. *Del Río*, 113 D.P.R. en la pág. 689.

> Articulable facts, then, must demonstrate a suspicion that the defendant possessed more than one ounce of marijuana, because possession of one ounce or less of marijuana is not a crime. There are no facts in the record to support a reasonable suspicion that the defendant possessed more than one ounce of marijuana.

*Cruz*, 459 Mass. en la pág. 469.

Por tanto, el más alto Foro de Massachusetts invalidó el registro de la evidencia incautada. Coincidimos con los criterios establecidos por el Tribunal Supremo de Massachusetts al aplicarlos a la controversia de este caso en que se percibe, sin más, la posesión de un arma de fuego sin que se puedan articular hechos que conduzcan a alguna sospecha sobre la utilización del arma de forma ilegal o sobre la ausencia de licencia para portar el arma. En este caso, la agente admitió que el registro surgió por la "curiosidad" de haber percibido un arma de fuego. No tenía sospecha alguna de que se había cometido un delito y no tenía sospecha sobre si el señor Báez López tenía o no licencia para portar la misma.

En suma, la decisión de una mayoría de este Tribunal cede ante el poder policiaco del Estado[25] para realizar un registro sin orden judicial dejando en rezago el valor conferido por nuestros constituyentes al derecho a la intimidad. En el proceso, no sólo prescinde de la protección de factura más ancha al derecho a la intimidad

---

[25] Poder que en palabras de Giorgio Agamben "is the site where the contiguity if not the constitutive exchange between violence and law characterizes the figure of the sovereign is visible in all its nakedness". Giorgio Agamben, *The Sovereign Police*, The Politics of Everyday Fear 61 (1993).

que establece nuestra Constitución, que hoy es letra muerta, sino que al adoptar la doctrina de evidencia incautada mediante el tacto, restringe el ámbito mínimo de protección que establece la jurisprudencia federal, colocándose al margen de la propia Constitución federal. Por tanto, con mucho pesar disiento del curso seguido por una mayoría de este Tribunal. En su lugar, hubiese confirmado la determinación de los foros inferiores y suprimiría la evidencia incautada.

El dictamen de hoy me obliga a esta última reflexión. En los últimos años, Puerto Rico ha sido testigo de un vertiginoso aumento en la criminalidad especialmente en la comisión de delitos graves con armas de fuego. Hace apenas un (1) año se trató de enmendar la Constitución del Estado Libre Asociado de Puerto Rico para limitar el derecho constitucional a la fianza, como mecanismo para reducir la criminalidad. No es un secreto, el sentido de inseguridad profunda que aqueja a la inmensa mayoría de los ciudadanos de este País. Todo aquello que nos hace sentir más tranquilos, más seguros, le damos la bienvenida. Aunque en ocasiones sin embargo, ciegamente.

"Buscamos seguridad. La necesitamos. **Vivir sin seguridad es difícil. Vivir exclusivamente para ella es peligroso. . . .**[N]o hemos de olvidar que **la seguridad ha de estar al servicio de la libertad y no la libertad supeditada a la seguridad. . . .**Entre el miedo y la necesidad, la seguridad habría de ser un aliado. Ahora bien, más parece que no pocas veces sobre ese miedo se

sustenta una desmedida consideración de la seguridad, que se ofrece como coartada del inmovilismo o de la delimitación o eliminación de los derechos individuales". Ángel Gabilondo, *Seguramente*, en *El País*, disponible en http://blogs.elpais.com/el-salto-del-angel/2012/08/ seguramente.html (última visita 5 de diciembre de 2013) (énfasis en el original). Como bien dijo Benjamín Franklin: "aquellos que sacrifican la libertad por seguridad no merecen tener ninguna de las dos". *Id*.




                              Anabelle Rodríguez Rodríguez
                              Juez Asociada